OLINGER MORTUARY ASSOCIATION, CROWN HILL CEMETERY ASSOCIATION, DENVER & CROWN HILL RAILWAY CO., HIGHLANDS CASKET MANUFACTURING CO., AND OLINGER HIGHLANDERS, INC., PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 118, 532.    Promulgated April 11, 1927.

1. Under the evidence in these cases, *held*, petitioner corporations were entitled to affiliation.

2. Rates of depreciation determined.

*James Grafton Rogers, Esq.*, and *Richard M. Crane, C. P. A.*, for the petitioners.

*A. George Bouchard, Esq.*, for the respondent.

The issues presented in these appeals and the facts from which they arise are the same in each. Accordingly, they were heard and are considered together. Docket No. 532 is the appeal of all the petitioners from the determination by the Commissioner of a deficiency of $812.12 in income and profits taxes for the calendar year 1919. Docket No. 118 comprises two distinct appeals. The major appeal thereunder is by all the petitioners from the determination by the Commissioner of a deficiency of $39,960.56 in income and profits taxes for the calendar year 1918. The minor appeal is by two of the petitioners from the determination by the Commissioner of deficiencies in inome taxes for the calendar years 1918 and 1919 in the respective amounts of $1,175.91 and $1,932.37.

The deficiencies result in part from the refusal of the Commissioner to permit all the petitioners to make consolidated returns of income as affiliated corporations. The Commissioner denied to the petitioners' affiliation as one group and held them to be affiliated, three corporations in one group and two in another. Petitioners also allege that Commissioner erred in that the depreciation allowed was insufficient.

FINDINGS OF FACT.

The petitioners are Colorado corporations with principal offices in the City of Denver. The Olinger Mortuary Association (hereafter sometimes referred to as the Mortuary), incorporated in the year 1918, was and is engaged in the business of selling services and merchandise connected with the burial of deceased persons. The Highlands Casket Manufacturing Co. (hereafter sometimes referred to as the Casket Factory) incorporated in the year 1918, was and is engaged in the manufacture of caskets and shipping boxes. The Crown Hill Cemetery Association (hereafter sometimes referred to as the Cemetery) incorporated in the year 1908, was and is engaged in the sale of burial lots or plots, the maintenance of cemetery grounds, and the sale of property and services incident to the burial of deceased persons. The Denver & Crown Hill Railway Co. (hereafter sometimes referred to as the Railway) incorporated some time prior to 1918, was and is engaged in the operation of an electric street railway between the northern boundary line of the City of Denver and the grounds of the Cemetery. The Olinger Highlanders, Inc., (hereafter sometimes referred to as the Highlanders), incorporated in the year 1919, was and is engaged in the operation of a boys' training corps.

Upon the death of his father in 1901, George W. Olinger became the owner of the Mortuary business, which had been conducted by his father in the City of Denver since 1890. Thereafter, Olinger

conducted the business as an individual enterprise until it was incorporated in July of 1918. In 1908, Olinger, convinced that Denver would support an additional burial park and that such a business would "interlace" with the Mortuary's business, organized and incorporated the Cemetery, which he caused to acquire a tract of land 1½ miles outside the city limits on the north side and about four miles distant from the location of the Mortuary, which was on the north side of the city proper. Shortly thereafter Olinger, for the purpose of providing means of transportation to and from the city and the grounds of the Cemetery, organized and incorporated the Railway, which he caused to construct and operate an electric street railway, connecting with the city's street railway, whose lines terminated at the city limits, to and from the Cemetery's park. Thereafter, but prior to 1918, Olinger organized the Casket Fatory, locating it on the north side of the city about three blocks from the Mortuary, for the purpose of supplying the Mortuary with caskets, shipping boxes, and other merchandise incident to its business, and operated the factory as an individual enterprise until its incorporation in July, 1918.

On January 1 of the years 1918, 1919, and 1920 the capital stock of the Cemetery was owned and held as follows:

|  | 1918. | | 1919. | | 1920. | |
|---|---|---|---|---|---|---|
|  | Shares. | Per cent. | Shares. | Per cent. | Shares. | Per cent. |
| George W. Olinger | 3, 488 | 79. 63 | 3, 599 | 82. 17 | 3, 907 | 89. 20 |
| Emma O. McDonald (mother of Olinger) | 23 | 0. 53 | 23 | 0. 53 | 23 | 0. 53 |
| Minority interests under option to Olinger | 730 | 16. 67 | 619 | 14. 13 | 311 | 7. 10 |
| Sub-total | 4, 241 | 96. 83 | 4, 241 | 96. 83 | 4, 241 | 96. 83 |
| Other minority interests | 139 | 3. 17 | 139 | 3. 17 | 139 | 3. 17 |
| Total | 4, 380 | 100. 00 | 4, 380 | 100. 00 | 4, 380 | 100. 00 |

During the years 1918, 1919, and 1920 all the outstanding capital stock of the railway was owned by the Cemetery.

Prior to July, 1918, the Mortuary and the Casket Factory were owned by Olinger and operated by him as an individual. In July, 1918, before going to France in war service, he incorporated both businesses as a means of protection to his family in the event anything should happen to him. One-half of the stock of the Mortuary (125,000 shares) was issued to Olinger's mother, one share thereof to his wife, and the balance (124,999 shares), to Olinger. The stock

issued to the mother was endorsed in blank and delivered to Olinger, who placed it in his safe, with the stock standing in his own name, where it remained during his absence. Early in 1919, after his return from France, all of the mother's stock, except one share, was transferred to Olinger, so that thereafter he owned in his own name 249,998 shares and there stood in the names of his mother and wife one share each. The stock of the Casket Factory was issued, one-third (16,667 shares) to Olinger, one-third (16,667 shares) to his mother, and one-third (16,666 shares) to his wife. All the stock of both the Mortuary and the Casket Factory has been at all times in fact owned by Olinger, those shares standing in the names of his mother and wife being issued to them merely for purposes of organization, and for personal reasons. The Mortuary and the Casket Factory elected, pursuant to the statute, to be treated as corporations for the entire year 1918, and made returns as such.

The capital stock of the Highlanders, incorporated in the year 1919, was issued, one-third (16,667 shares) to Olinger, one-third (16,667 shares) to his mother, and one-third (16,666 shares) to his wife. Olinger was the *de facto* owner of the stock issued to his mother and his wife and he was entirely and exclusively in control of the activities of the Highlanders.

George W. Olinger has been the president of all the petitioners from the respective dates of their organization, and during the taxable years was in active control of them. His control of all the petitioners was absolute. He determined their policies and directed their activities. He selected the directors for each of them, the directors in all corporations being practically the same persons, and their qualifying shares were his stock, properly endorsed. Every employee of each corporation was engaged only on Olinger's approval and every pay check paid to any employee of each of the petitioners was drawn by him personally, except during his absence from the city, when such checks were signed by his nominee. He exercised entire supervision, financial and otherwise, over all the corporations, dictated every detail of their activities, and operated the businesses as he saw fit. No funds were withdrawn from any of the corporations for any purpose except upon his order. His mother exercised no authority in the management of the businesses and had no duties to perform in connection therewith, her activities consisting in maintaining the general atmosphere of the business, supervising the care of the ladies and children, giving general support to Olinger in his work, and acting in the general capacity of "housekeeper." Olinger's wife took no part in the conduct of the businesses and received no funds therefrom. Olinger's mother received no

salary or specific compensation, but was permitted to draw from the businesses such sums, at such times, as she required for her needs. Olinger drew no fixed salary but drew from the businesses such sums as he desired.

Each of the petitioners was considered as merely a part or division of a single unit, and they were operated as one enterprise. Funds were constantly withdrawn by Olinger from one, in most cases the Mortuary, and devoted to the needs of the others, without interest and often without reimbursement. Funerals were conducted by the Mortuary and interments made by the Cemetery free of all charges in deserving cases upon the order of Olinger. The employees and equipment were constantly interchanged between them without charge at the direction and in the discretion of Olinger. The offices of all were lodged in one building, that of the Mortuary, and the books of all were kept by a single auditor, who received no compensation except from the Mortuary. The telephone service of all was supplied through one switchboard maintained by the Mortuary. The Casket Factory supplied merchandise to the Mortuary at cost, no profit to the Casket Factory being contemplated.

The Mortuary was the foundation and support of all the other petitioners. It was the principal money-earner, in fact the only money-earner except the Cemetery, the earnings of which were negligible, and was the one upon which all the other petitioners relied for financial support. By the year 1918 the Mortuary had grown to be one of the five largest mortuaries in the United States, and during the taxable years, which were the years of the "flu" epidemic, it was caring for approximately 50 per cent of Denver's deaths. Approximately 95 per cent of the cases cared for by the Mortuary were interred in the Cemetery's park and approximately 90 per cent of the interments in the Cemetery's park were cases cared for by the Mortuary. The Casket Factory was established solely to supply the needs of the Mortuary. It maintained no sales organization, and more than 90 per cent of the goods manufactured were supplied to and taken by the Mortuary. The Railway was simply a "feeder" for the Cemetery, a connecting link in the transportation facilities between the City of Denver and the Cemetery's grounds.

During the taxable years the Mortuary conducted between five and eight funerals a day, at each of which from fifty to seventy-five persons attended, so that approximately 100,000 persons were accommodated during each year. This large volume of business, with so many people passing in and out of the Mortuary, subjected

the equipment and facilities to heavy use. The depreciable assets of the Mortuary, as alleged in the petitions, were: (1) buildings, (2) equipment, (3) automobiles, (4) machinery, and (5) furniture. The "equipment" consisted of "furniture and fixtures, reception-room furniture, office furniture, desks, office chairs and files, rugs, draperies, curtains, organ, piano, clocks, pictures and paintings, beds, linen, mattresses, slumber-room equipment, embalming paraphernalia and surgical instruments, casket trucks (small carriers used inside the building), folding chairs, janitors' equipment, floor and ornamental lamps, vases, cots, doorpiece equipment, and bookcases." The cost of these articles was $21,000, their average life ten years, and their salvage value was negligible. The "automobiles" consisted of two Cunningham hearses, one Winton limousine, one Cunningham carrier, one Willys-Knight touring car, one Packard limousine, a Ford roadster, and a Ford delivery truck. The cost of these automobiles was $42,052.24, their average life was three years, and they had an average salvage value of 25 per cent of the cost.

The depreciable assets of the Cemetery, as alleged in the petitions, were: (1) greenhouse buildings, (2) caretaker's house, (3) furniture, (4) auto trucks, (5) water system, (6) sundry equipment, and (7) tools and implements. The "greenhouses," built in 1912, were constructed of glass with wooden frames, and upon brick foundations, with cement walks inside. The "auto trucks" were used to pull out boxes, for carrying tents, chairs, lowering devises, and cement vaults, and for hauling out logs. The "water system" consisted of a pump at a lake, a wooden tank, and distributing pipe lines. The piping was of the cheapest grade of black pipe and the frequent leaks that developed necessitated constant repairs and replacement with galvanized pipe. The Cemetery's park, consisting of 490 acres, was opened in 1908. The cost, or depreciable value, of the "greenhouses," in the year 1918, was $18,981.74, and in the year 1919 was $20,806.51, and they had a total useful life of fifteen years. The cost, or depreciable value, of the "auto trucks" in the year 1918 was $3,649.85 and in the year 1919 was $3,085.37, and they had a total useful life of three years. The cost of the water system was $18,041.58.

OPINION.

VAN FOSSAN: At the hearing of these appeals counsel for respondent waived the jurisdictional questions raised by the answers and admitted the jurisdiction of this Board. There remain for our consideration only two issues: (1) The right of the petitioners to

affiliation in one group, and (2) the correct amount of depreciation allowable as a deduction.

The separate appeal of two of the petitioners, which is the minor appeal under Docket No. 118, arises solely by virtue of the respondent's denial of the right of all petitioners to affiliation. In the light of our conclusions upon the affiliation question, we deem it unnecessary to decide the issues raised by the separate appeal. Likewise, the issue relating to invested capital, raised by the pleadings, is disposed of by our decision of the affiliation issue, and need not be further considered.

The facts present a clear case of a group of corporations joined together for the more efficient conduct of a single business, each corporation being merely a unit in a greater whole, and all under the control and direction of a single head. The entire system is merely an expansion or enlargement of the one business, the Mortuary, which has, at all times, been owned and controlled by George W. Olinger, who was responsible for the creation of all the units in this system. Substantially all of the stock of all the petitioners has at all times been owned or controlled by Olinger and he has dictated every policy and even the details in the operation of each of them. The petitioners fully meet the requirements of section 240(b)(2) of the Revenue Act of 1918.

The Mortuary, the Casket Factory, the Cemetery and the Railway are, therefore, deemed to have been affiliated corporations in 1918, and all five of the petitioners are deemed to have been affiliated corporations in 1919, within the meaning of the Act. It follows, therefore, that they are entitled, under section 240(a), to file consolidated returns for the respective years for income-tax purposes. See *Appeal of Wright Cake Co.*, 2 B. T. A. 58; *Appeal of Monroe Furniture Co.*, 2 B. T. A. 743; *Appeal of Brannum Lumber Co.*, 2 B. T. A. 821; *Appeal of Tri County Light & Power Co.*, 2 B. T. A. 1165; *Appeal of Peru Chair Works*, 3 B. T. A. 29; *Appeal of West 28th Street Corporation*, 4 B. T. A. 147; *Appeal of Kolynos Co.*, 4 B. T. A. 520; *Appeal of Star Porcelain Co.*, 4 B. T. A. 989.

The fact that two of the petitioners, the Cemetery and the Railway, might be entitled to affiliation as between themselves under section 240(b)(1) is not sufficient reason to deny them affiliation with the other petitioners when the requirements of section 240(b)(2) are satisfied.

There are listed in the petitions certain assets of the Mortuary and the Cemetery on which it is alleged respondent has not allowed sufficient depreciation. The method of computation employed by the respondent or the exact amounts allowed do not appear. The

petitions state only the total amount allowed. Of all the assets as to which petitioners seek an additional allowance for depreciation, evidence was submitted only as to four items. These items are the "equipment" and the "automobiles" of the Mortuary and the "greenhouses" and "auto trucks" of the Cemetery.

The record being silent on the point, we do not know whether the respondent used a composite rate of depreciation or made a definite computation as to each item, or group of items. If the latter, then the depreciation on the four items as to which proof was introduced should be recomputed in accordance with the findings of fact. If, however, a composite rate was used, or a lump sum allowed, there being evidence as to only part of the assets, it will be necessary to rule against the petitioners on this issue.

*Judgment will be entered on 15 days' notice, under Rule 50.*